JUDGE LINDSAY
delivered the opinion oe the court.
Thomas C. Jones was indicted in the Franklin Criminal Court for usurping the office of clerk of the Court of Appeals. The indictment was founded upon the provisions of section 1, article 25, chapter 29, of the General Statutes, which is as follows, viz.: “ If any person shall usurp any office established by the constitution or laws of this commonwealth, or shall knowingly hold or pretend to exercise such office after his election or appointment thereto shall have been declared by a court of competent jurisdiction illegal or void, or after his term of office has constitutionally and legally expired, he shall *729 be guilty of a misdemeanor, and fined in a sum not less than five hundred nor more than fifteen hundred dollars.” The indictment contains two counts.
The first count charges that Jones, in June, 1869, since the adoption of the present constitution of Kentucky, accepted a challenge, sent to him by J. Hale, to fight a duel with deadly weapons, both parties at the time being citizens of Kentucky; that said acceptance disqualified Jones from holding office in Kentucky; and that he afterward did usurp and hold the office of clerk of the Court of Appeals in Franklin County.
The second count charges that Jones accepted the said challenge, and that he continued to hold and exercise the office of clerk of the Court of Appeals after his election had been declared illegal by a contesting board, duly and legally organized to try the question. It sets out in detail that said board, after due trial, found and decided that Jones did accept a challenge sent him by Hale, a citizen of Kentucky; that the acceptance was after the adoption of the present constitution; and that it took place in Daviess County. It is further averred that said board was a court of competent jurisdiction to inquire into and determine all these questions, and to declare the election under which Jones claims the office to be illegal and void; and that in the exercise of such jurisdiction and p.ower it did adjudge that Jones, by reason of the facts so found, was ineligible to the office; that his election was illegal and void, and that the office was vacant; and that, notwithstanding said judgment, Jones is knowingly and willfully holding and exercising the said office of clerk of the Court of Appeals.
To this indictment a demurrer was sustained. The prosecution was thereupon dismissed, and from the judgment of dismission the commonwealth prosecutes this appeal.
Section 1, article 8, of the constitution provides that “ members of the General Assembly, and all officers before they enter upon the execution of the duties of their respective offices, and *730 all members of the bar before they enter upon the practice of their profession, shall take the following oath or affirmation: “I do solemnly swear (or affirm, as the case may be) that I will support the constitution of the United States and the constitution of this state, and be faithful and true to the commonwealth of Kentucky so long as I continue a citizen thereof, and that I will faithfully execute, to the best of my abilities, the office of-according to law; and I do further solemnly swear (or affirm) that since the adoption of the present constitution I, being a citizen of this state, have not fought a duel with deadly weapons, within this state nor out of it, with a citizen of this state; nor have I sent or accepted a challenge to fight a duel with deadly weapons with a citizen of this state; nor have I acted as second in carrying a challenge, or aided or assisted any person thus offending, so help,me God.”
Sections 20 and 21 of the same article provide: 20. “Any person who shall after the adoption of this constitution, either directly or indirectly, give, accept, or knowingly carry a challenge to any person or persons to fight in single combat with a citizen of this state with any deadly weapon, either in ox-out of this state, shall be deprived of the right to hold any office of honor or px-ofit in this commonwealth, and shall be punished otherwise iix such maixner as the General Assembly may prescribe by law.” 21. “The governor shall have power, after five years from the tinxe of the offense, to pardon all persoixs who shall have in any wise participated in a duel, either as px-incipals, seconds, or otherwise, and to restore him or them to all the rights, privileges, aixd immunities to which he or they were entitled before such pax-ticipation; and upon the presentatioix of such pardoix the oath prescribed ixx the first section of this article shall be varied to suit the case.”
The indictment shows that Jones was elected clerk of the Court of Appeals at the August election, 1874; that the fact *731 of his election was duly certified by the board whose duty it was to compare the polls and canvass-the election returns; that he presented his certificate of election to the Court, of Appeals, and that he was inducted into office by being “ qualified and sworn as is prescribed by law;” and that after all this the contesting board rendered the judgment hereinbefore set out. It fails to show that Jones had ever been indicted, tried, and convicted of the offense of accepting a challenge to fight a duel with deadly weapons with a citizen of Kentucky, unless the finding and judgment of the contesting board can be treated as a conviction.
In support of the first count in the indictment it is argued that the ineligibility or disqualification for office prescribed by the constitution arises immediately out of the commission of either of the forbidden acts; that it attaches at once, and is in no wise dependent upon a judicial ascertainment of the existence of the disqualifying fact. If this be the true construction of section 20, article 8, of the constitution, it is self-executing. It defines in apt language a public offense, and prescribes a punishment therefor, which punishment is the deprivation of the offender “of the right to hold any office of honor or profit in this commonwealth.” It confers upon the General Assembly the power to inflict other punishment, but does not leave the infliction of the punishment prescribed by'the constitution to depend upon legislative action.
That the deprivation of the right to hold office is a punishment does not, in our opinion, admit of serious question.
“ The deprivation of any rights, civil or political, previously enjoyed may be punishment, the circumstances attending and the causes of the deprivation determining this fact. Disqualification from the pursuits of a lawful avocation or from positions of trust, or from the privilege of appearing in the courts or acting as an executor, administrator, or guardian, may also, and often has been, imposed as punishment. ....... *732 The theory upon which our political institutions rest is that all men have certain inalienable rights; that among these are life, liberty, and the pursuit of happiness; and that in the pursuit of happiness all avocations, all honors, all positions are alike open to every one, and that in the protection of these rights all are equal before the law. Any deprivation or suspension of any of these rights for past conduct is punishment, and can in no otherwise be defended.” (4 Wallace, 320-22.)
In re Dorsey (7 Porter, Ala., 293) Justice Goldthwaite says, “I have omitted any argument to show that disqualification from office or from the pursuit of a lawful avocation is a punishment; that it is so is too evident to require any illustration. Indeed it may be questioned whether any ingenuity could devise any penalty which would operate more forcibly on society.” To the same effect is the case of Barker v. The People (3 Cowen, 686.)
Deprivation of the right to hold office was a common-law punishment. (4 Blackstone’s Commentaries, 44.) It was one of the punishments prescribed by the legislature of this state for the offense of dueling as early as the year 1799. (1 Stat. Laws, 579.)
In framing the constitution the convention did not propose to create a new offense nor to prescribe a new mode of punishment. The offense and the character of punishment prescribed had existed in Kentucky for ■ moré than fifty years before they received the recognition and approbation of the convention that framed and the people who ratified and adopted our present constitution. That dueling was understood to be a public offense, and the deprivation of the right to hold office a punishment, is manifest from the provisions of section 21, heretofore quoted in full. It is therein termed an offense, and the governor is authorized after a given time to pardon it, and to restore to the party who has offended all *733 the rights, privileges, and immunities to which he was entitled before participating in the forbidden act. It was argued by counsel that the pardon thus provided for relieves against the penalties provided by the statute alone, and that the constitutional disqualification or penalty must be relieved against by an express restoration of the forfeited rights, privileges, and immunities. We do not so construe the section. The statutory penalties might be relieved against under the general power of the governor to grant reprieves and pardons. The pardon he is here authorized to grant is intended to, and does of itself, restore the forfeited rights, privileges, and immunities. Hence the concluding sentence or clause, “And upon presentation of such pardon the oath prescribed in the first section of this article shall be varied to suit the case.”
. The commonwealth further insists that if the deprivation of the right to hold office be a punishment, it is not a criminal but a political punishment, inflicted because of the duelist having by his voluntary act unfitted himself for holding office. For the present we do not deem it necessary to inquire as to the distinction between criminal and political punishments. If section 20, article 8, of the constitution, defines a public offense, and prescribes as a punishment therefor the deprivation of the right to hold office, and was not intended to, and does not merely prescribe an ineligibility to office, our conclusion on this branch of the case will necessarily be the same, whether the punishment be criminal or political.
That the primary purpose of said section was not merely to prescribe qualifications, to fix disqualifications, and to define ineligibility to office has, as we think, already been made reasonably clear; but an examination of the peculiar language in which that section is couched, and a comparison of that language with that of other sections of the constitution, will still further strengthen that conclusion.
*734 The qualifications of members of the House of Representatives and of senators are prescribed by sections 4 and 16 of article 2 of the constitution, and sections 27 and 28 of the same article prescribe who shall not be “eligible” to the General Assembly, even though they may possess all the affirmative qualifications. Sections 4 and 16 of article 3 determine who may be governor and lieutenant-governor of the commonwealth, and articles 4 and 6 prescribe the qualifications of judges of the Court of Appeals, of the clerk of that court, of the judges of the circuit courts, of the Louisville Chancery Court, and of the county courts, and of all the executive and ministerial officers of the districts and counties of the state.
When mere temporary disqualifications for office, resulting from the voluntary, lawful, and in many instances the commendable act of the party, are defined, we find that the terms “eligible” and “ineligible” are always used as in the third-section of article 3, which provides that “the governor shall be ineligible for the succeeding four years after the expiration of the term for which he shall have been elected; ” and as in section 18, article 8, which declares that “no member of Congress nor person holding or, exei’cising any office of trust or profit under the United States, or either of them, or under any foreign power, shall be eligible as a member of the General Assembly of this commonwealth, or hold or exercise any office of trust or profit under the same.”
The giving, accepting, or knowingly carrying a challenge to fight a duel with deadly weapons with a citizen of this state was intended to do more than merely to render the guilty party ineligible to office, in the sense of the ineligibility contemplated in the provisions quoted and referred to. The convention and the people intended that such offenders should be permanently deprived of one of the attributes of citizenship. Therefore the words eligible arid ineligible are omitted from section 20 of article 8, and a term used which *735 has a fixed, determinate, and well-understood legal and constitutional signification.
Said section provides that the offender shall be “ deprived of the right to hold any office of honor or profit in this commonwealth,” which is in effect to dispossess him of a right which the Supreme Court of the United State's terms “inalienable” (4 Wallace, 321); to take from him “rights, privileges, and immunities” to which he had theretofore been entitled (sec. 21, art. 8, State Constitution); to strip him of one of the highest and most valued attributes of citizenship; and thus to inflict upon him that penalty which operates most forcibly upon society.
The word “deprived” is used in this section in the same sense in which it is used in section 12 of the bill of rights, and in the fifth article of amendment to the Federal constitution. If therefore the twentieth section of the eighth article of the constitution is to be construed as insisted on by the commonwealth’s counsel, it is a self-executing penal statute; it tries without accusation, hears and determines without proof or opportunity for defense, and imposes the penalty without notice to the culprit of his condemnation.
Such a statute is subversive of that clause of Magna Charta which declares, in relation to a freeman, “nor will we pass upon him nor condemn him but by the lawful judgment of his peers or by the law of the land;” and of the twelfth section of the bill of rights, which declares “ nor can he be deprived of his life, liberty, or property unless by the judgment of his peers or by the law of the land.”
If a rational construction, consistent with the principle of free government embodied in these declarations, can be given to said section, it will be preferred, not only because it will harmonize with our theory of government, but because it will leave unimpaired one of those venerable safeguards thrown around individual rights by our English ancestors, and which *736 has been re-asserted by the people of Kentucky in each and all of the three constitutions under which they have lived.
It is insisted that the intention that the constitutional provisions relating to dueling shall be self-enforcing is- manifested by the oath that all officers are required to take upon being inducted into office.
It is true that no person can enter upon the discharge of the duties of an office created by the constitution or laws of this state without first swearing or affirming that since the adoption of the present constitution he has not sent or accepted a challenge to fight a duel with deadly weapons with a citizen of this state, nor acted as second in carrying a challenge, or aided or assisted any person so offending; and it is equally true that to the extent that persons are prevented from standing for office, or from being inducted into office after election or appointment, on account of their inability or unwillingness to take this oath, the twentieth section is enforced without a resort to the ordinary tribunals of justice.
The original, and as yet the principal, object of official oat-hs is to require -from the person about to enter upon the discharge of the duties of a public trust a guaranty that he will be conscientious in the discharge of such duties- and faithful to the public obligations he is about to assume. Such oaths are not usually made the instruments or means of. inflicting punishments or forfeitures incurred on account of the commission of public offenses; and in every case in which they have operated to punish for past offenses they have been held void, upon the ground that they are ex post facto laws. (4 Wall. 319, 333.)
When they operate as a means of punishment as to future offenses they can be defended only upon the theory that the citizen takes his right to hold office under the constitution, coupled with the condition that he is willing and that he can conscientiously take the oath or affirmation therein prescribed. *737 Further than this the oath does not make the section under consideration self-executing. The doctrine announced in the case of Morgan v. Vance (4 Bush, 323) is not more comprehensive than we here state it. The intimation that thei’e are disqualifications for office depending upon acts and not upon conviction was extra-judicial. It illustrated no issue presented by the record, nor was it necessary or proper in view of the mandate of the court. It was not necessary to direct that Morgan should be allowed to amend his answer. The judgment against him was reversed because his answer was already good. Nor was it necessary to suggest to Vance to amend his petition. Its sufficiency had not been questioned, and there was no reason -why he should aver a fact that he could have proved without averring. The novel character of the mandate indicates that that case did not receive that serious consideration necessary to make it a controlling precedent upon a grave constitutional question.
Counsel for the commonwealth correctly says that there are but two modes in which the deprivation of the right to hold office can be made effectual—one by the act itself producing the deprivation; the other by a conviction of the offense in a criminal prosecution. The forcé of the suggestion following this statement of the case can not be questioned. Counsel says, “If the convention which framed the constitution intended to require conviction of the acts named in section 20, it would have been easy by the use of the word ‘conviction’ or ‘convicted,’ as they were used in sections 3 and 4 of the same article of the constitution, to have made that meaning clear and unequivocal.”
The mere omission of this word in this section raises at most but a presumption that it was intended that it should receive a construction different from those sections in which the word was used. To give to the omission greater weight than this “would be to suppose that the framers weighed only the *738 force of single words, as philologists or critics, and not whole clauses and objects, as statesmen and practical reasoners.” (Story on Constitutions, 454.)
Upon the other hand, if, instead of the phrase “shall be deprived,” the word “ineligible” or the phrase “shall not be eligible” had been used in section 20, some of the difficulties attending the argument to show that it is self-executing would have been obviated. We have already shown that the change of language or phraseology in this regard was deliberate and intentional, and that apt and appropriate words are used to show that participation in a duel between citizens of this state was intended to be treated as a public offense, and that the deprivation of the right to hold office is a penalty or punishment to be inflicted upon those who may be guilty of said offense.
Section 21 does not prove that section 20 is absolutely self-executing. As we have already shown, it is self-executing when the party admits his guilt, and can not therefore take the oath of office. In such a case the practical exclusion from office commences with the act; and as the governor can not relieve against it for five years, the limitation upon his power to pardon is made to commence from the time of the offense instead of from the time of the conviction.
We have been referred to no instance of a self-executing criminal statute, and, except as to forfeitures growing out of the violation of the revenue laws of the general government and of some of the states, wre have, with one or two exceptions, found none either in state constitutions or in legislative enactments, that have not been declared unenforceable. The supreme courts of Missouri and West Virginia upheld such statutes; but the decision of the first was reversed) and the doctrine of the last overruled by the Supreme Court of the United States. Besides this, their decisions were rendered at a time and under circumstances which rob them of the weight to which the opinions of those courts would otherwise be entitled.
*739 By the act of 1808 (2 Statute Laws, 1219) mulattoes and free negroes, were prohibited from immigrating to this state'. It was made the duty of the county court of any county into which any of these people should come to direct him or them to enter into recognizance with surety in the sum of five hundred dollars, conditioned that he would depart and remove without the limits of the state within twenty days thereafter and never more return; and if he failed to give the recognizance, the court was authorized and required to make an order; to be executed by the sheriff, for the immediate sale of the negro or mulatto so failing, for and during the term of one' year, etc.
This court in the case of Doram, &c. v. Commonwealth (1 Dana, 331) held that a proceeding under this act was in the nature of a prosecution by information for an offense against the commonwealth; that the penalty was a temporary disfranchisement of a freeman as a punishment for violating a public and economical law of the state; and declared that, inasmuch as it dispensed with a jury, it could not be constitutionally enforced.
In the case before us it is contended that a citizen may “be deprived” of “rights, privileges, and immunities,” which are by the Supreme Court of the United States classed among the inalienable rights of a freeman, not only without a trial by jury, but without a trial at all.
A case more similar to that under consideration is that of Gaines v. Buford (1 Dana, 481). In 1824 the legislature enacted that unless the owners of certain lands situate in the state should before the 1st day of August, 1825, make certain improvements, the title should' forfeit and immediately vest in the commonwealth, without judgment or office found. In passing upon this act Judge Nicholas said, “To enjoin what shall be done or what left undone, and to secure obedience to the injunction by prescribing appropriate penalties, belong *740 exclusively to legislation. To ascertain a violation of such injunction and inflict the penalty belongs to the judicial function.”
. “ So far as the act in question undertakes to divest Gaines of his title and vest it in the state, it is a legislative infliction of the penalty; it is an assumption to that extent of judicial magistracy without affording the accused the benefit of those forms and guards of trial which are his constitutional right wherever a citizen is sought to be punished,- either in his person or by forfeitures of his property, for alleged violations of the penal enactments of the state. The right to forfeit is merely an incident to the power to punish guilt. Without guilt the forfeiture can not be incurred. The guilt can not be ascertained by the legislature, nor otherwise than by a direct criminal procedure of some sort, and a judicial determination thereon.”
Apply this reasoning to the twentieth section of the eighth article of the constitution as construed by the commonwealth’s counsel, and it will be seen at once that the construction converts that section into a bill of pains and penalties, and thereby makes it repugnant to that clause of the Federal constitution which provides that “ no state shall pass any bill of attainder.” Judge Nicholas in the same case said, “A British act of parliament might declare that if certain individuals, or a class of individuals, failed to do a given act by a named day, they should be deemed to be and treated as convicted felons or traitors. Such an act comes precisely within the definition of a bill of attainder, and the English courts could enforce it without indictment or trial by jury.”
- This definition was quoted with apparent approval by the Supreme Court of the United States in the case of Cummings. A- slight transposition of the language used will show its striking application to the constitutional penal statute under consideration, as construed by the representative of the com *741 monwealth. Here it is insisted that Jones did a given act, criminal in its nature, and that therefore he should be deemed to be and treated as a convicted offender, and that the courts should enforce the prescribed penalty without indictment and without trial by jury.
' We can not believe that the convention and the people of the state intended that the section should be so construed as to make it conflict with the constitution of the United States, and to make it repugnant to that great underlying principle of the criminal and penal law, that every person shall be held and treated as innocent until his guilt is regularly and legally established. This conclusion is supported by the reasoning of this court in the case of Burkett v. McCarty.*
We have not failed to consider the fact that corrupt men, who have not been and possibly can not be convicted of the disqualifying offense, may under our construction of the constitution falsely take the oath of office, and thereby enjoy the honors and emoluments attached to and growing out of public positions. But as no human law can be perfectly executed, it is better that the provisions of this section of the constitution shall sometimes be evaded than that absolute obedience shall be secured through the arbitrary means resorted to by governments in which individual rights are less highly prized than in this.
We need not determine whether a conviction under an indictment based upon the provisions of article 20 of chapter 29 of the Revised Statutes would conclude the party as to the essential fact of the citizenship of the other party participating in the duel. It is sufficient to say that the constitutional provision is of itself a perfect statute, and that any one violating it may be indicted, tried, convicted, and by the judgment of the court deprived of the right to hold any office of trust or profit,” independent of any legislative action *742 on the subject. If this power did not exist by virtue of the constitution, the provision against dueling might, by want of action upon the part of the legislature, be rendered utterly nugatory as to the persons in office at the time of the commission of the offense, and as to persons not desiring to stand for office, nor to occupy public positions of trust and honor.
■The first count does not aver that Jones entered upon the discharge of the duties of the office of clerk of the Court of Appeals without taking the constitutional oath of office, nor that previous to the finding of the indictment the fact that he had accepted a challenge to fight a duel with deadly weapons with a citizen of Kentucky, since the adoption of the present constitution, had been judicially ascertained, and he thereby deprived of the right to hold the office. The criminal court did not therefore err in holding that said count was insufficient in law.
In the second count it is averred that the contesting board did adjudge and determine that Jones had accepted a challenge to fight a duel with deadly weapons with a citizen of Kentucky subsequent to the adoption of the present constitution; and it is further averred, as a conclusion of law, that said board was “ a court of competent jurisdiction to hear and try said matter,” arising as it did upon the contest inaugurated and prosecuted by John B. Cochran, who was the opposing candidate for the office. It becomes necessary therefore to inquire into the duties and powers of the contesting board and to determine as to its jurisdiction.
Section 24, article 8, of the constitution provides that “the General Assembly shall provide by law for the trial of any contested election of auditor, register, treasurer, attorney-general, judges of circuit courts, and all other officers not herein specified.”
Article 7, chapter 33, of the General Statutes- defines the jurisdiction and duties of contesting boards. It provides that *743 the board to try a contest as to the election of a clerk of the Court of Appeals shall be composed of the governor, attorney-general, auditor, treasurer, and secretary of state. Its duties are defined as follows:
“Sec. 8. Where it shall appear that the candidates receiving the highest number of votes given have received an equal number, the right to the office shall be determined by lot, under the direction of the board] Where the person is found not to have been legally qualified to receive the office at the time of his election, a new election shall be ordered. Where another than the person returned shall be found to have received the highest number of" legal votes given, such other shall be adjudged to be the person elected and entitled to the office.
“Sec. 9. Its (the board’s) decision when made shall be final and conclusive.”
“ Sec. 11. When a new election is ordered, or the incumbent adjudged not to be entitled, his powers shall immediately cease; and if the office is not adjudged to another, it shall be deemed vacant.”
It is plain that the action of the board within the limits of its jurisdiction is final and conclusive as well upon the courts as upon the other departments of the government. But it is equally clear, and we do not understand the proposition to be questioned by the commonwealth’s counsel, that when the courts are called upon to enforce the judgments of the board, or to punish those who disobey its mandates, they have the power to inquire into and determine as to its jurisdiction in the particular case in hand. Without jurisdiction to act, the finding and judgment of any board or tribunal is necessarily void, and may be so treated by all the world. The cases of Batman v. Megowan (1 Met. 538) and Newman v. Kirtley (13 B. Mon. 517) are perfectly consistent with this view. In Batman’s case the question of the jurisdiction of the county *744 contesting board was directly considered, and the mandamus refused upon the sole ground that the notice of contest had not been given within the time fixed by law, and therefore that the board had no jurisdiction to hear and determine the matter. And however anxious the legislature may have been at and before the time of the decision in Kirtley’s case to prevent the ordinary tribunals of justice from being harassed and possibly overwhelmed with the investigations, and involved in the excitements to which contested election cases may be expected to give rise, that anxiety has ceased to exercise a controlling influence over legislation, and appeals from the decisions of county boards are now allowed to the circuit courts, and from these tribunals to this court.
In view of the finality of the action of the contesting board in cases of state officers, it is a matter of regret that its jurisdiction and powers are not more accurately and specifically defined by' the statute. As the law exists at present, they are to be implied from the duties imposed upon the board in certain-named contingencies. As a new election is to be ordered when the person returned is not found to have been legally qualified to receive the office at the time of his election, and as the incumbent may be adjudged not to be entitled to the office, the power to inquire as to his qualifications must be implied. How far the legislature intended this implied power to be carried, and to what extent the legislature can constitutionally empower the board to exercise it, are the two principal questions upon the decision of which the sufficiency of the second count in the indictment must depend.
We concur in the construction of the constitution as given by the court in the case of Hall v. Hostetter (17 B. Mon.), “that the words qualifications and qualified are used therein in their most comprehensive sense, to signify not only the circumstances that are requisite to render a citizen eligible to office or that entitle him to vote, but also to denote an exemp *745 tion from all legal disqualifications for either purpose; ” and we concur fully in the illustration thus given in that case: “The circumstances under which a citizen is entitled to vote are prescribed in the constitution; but he may have those qualifications and still by some act have become disqualified, and not be a qualified voter, in the sense in which the word is used in the constitution. The word qualifications seems to be used in the same sense, and implies not only the presence of every requisite which the constitution demands, but also the absence of every disqualification which it imposes.”
The implied powers of the contesting board as to the qualifications or disqualifications of the person elected to office go to the extent here indicated. It may investigate and determine finally and conclusively whether he possesses each and all of the qualifications which the constitution prescribes, and whether or not there are present any or all of the disqualifications which it imposes.
The board had the power to ascertain whether Jones was a citizen of the United States; whether he had been a resident of the state of Kentucky two years next preceding his election; whether he was twenty-one years of age; and whether he had the certificate of a judge of the Court of Appeals or of a judge of the circuit court that he had been examined by the clerk of his court under his supervision, and that he was qualified for the office. It had the further power to ascertain whether he was holding or exercising any office of trust or profit under the United States or either of them, or under any foreign power, and probably whether he had been convicted of any crime or misdemeanor (participation in a duel with a citizen of Kentucky included), and by the judgment of conviction “deprived of the right to hold” or rendered constitutionally incapable of holding an office under the constitution and laws of the commonwealth. This last-named power is not altogether clear, and the court is not so fully *746 agreed as to its existence as to feel authorized in this case to conclude the question; but for the purposes of this decision its existence will be assumed, and the branch of this case now under consideration will be disposed of upon that assumption.
In any view of the law the board could not enter upon an original investigation as to whether Jones had accepted a challenge to fight a duel with deadly weapons with a citizen of Kentucky, and upon the evidence therein heard adjudge that he is .not entitled to hold the office to which he was elected.
We have already determined that the practical deprivation of the right to hold office does not necessarily attach eo instanti upon the commission of the prohibited act or acts; that the constitution does not, and from the nature of things can not, enforce itself, unless the party charged with the disqualifying offense concedes his guilt, and declines to be inducted into office by taking the constitutional oath. Where he denies the charge, and stands ready and willing to purge his conscience, the presumption of innocence applies in his favor just as in the case of any other citizen charged with a violation of the criminal or penal laws." This presumption can not be overcome in order to enable the commonwealth to deprive a citizen of a valuable right, and thereby to inflict upon him punishment, except by the finding of a jury in a regular judicial proceeding, had by a court of competent criminal or penal jurisdiction.
While we are fully persuaded that the deprivation of the right to hold office is a punishment of the gravest nature, we can not admit the conclusion which-counsel insists must follow therefrom. The special provisions of the constitution providing for the infliction of this punishment do not necessarily cut through the general provisions, nor is the punishment prescribed, whether it be criminal or political, an exception to the bill of rights. There are no implied exceptions to the bill of rights. Every thing in that article is declared to be excepted out of the general powers of- government, and is-to *747 remain forever inviolate. (Section 30, article 13, Constitution.) In construing and harmonizing the different provisions of the constitution, this solemn declaration is never to be lost sight of, and more especially in cases involving the personal rights of the citizen is it entitled to high consideration.
It appears from the indictment that Jones presented to the Court of Appeals, on the — day of September, 1874, his certificate of election, and that he was by said court on that day qualified and sworn as provided by law. It is to be assumed that he took the oath prescribed by the constitution, and became the incumbent of the office, as contemplated in such cases by subsection 11, section 1, of the article and chapter relating to trials of contested elections. Having purged his conscience and complied with the fundamental condition attached to his right to hold office in this commonwealth, he was prima facie an innocent man, and by the constitution and laws presumptively entitled to the honors and profits of the position.
If by the action of the majority of the contesting board his right to continue in the possession and enjoyment of the office ceased and determined, then it was the judgment of the board and not the alleged acceptance of the challenge that deprived him of the right to hold the office and receive its emoluments, and converted his subsequent holding into an act of usurpation. We are of opinion that a contesting board can not thus try and convict a citizen of a penal offense, and by its judgment inflict upon him a punishment of any kind, criminal or political.
But it is argued that the courts are bound to assume that the contesting board had before it such evidence as authorized. its finding, or rather that the character of the evidence upon which it acted can not be inquired into in order to determine as to its jurisdiction. These propositions are both in the main correct; and if the board had assumed the power to act upon an averment in the notice of contest that Jones had been *748 deprived of the right to hold office by the judgment of a court of competent jurisdiction, and had found that such averment was true, and upon the disqualification imposed by said judgment had declared the office vacant and the election void, said two propositions would be conclusive of the case. But, on the contrary, the indictment shows that Cochran based his contest, among others, upon the ground that Jones accepted the challenge sent to him by Hale; that the board tried the “matter of contest;” and that a majority of its members rendered their decision in writing, and then and there “declared and adjudged, in effect and substance, that the said Thomas C. Jones ‘did on the 6th day of June, 1869, accept a challenge from J. Hale, a citizen of Kentucky, to fight him in single combat with deadly weapons;’ ‘and that said Thomas C. Jones is ineligible to hold and exercise the office of clerk of the Court of Appeals;’ and that said office is vacant;” and it further shows that “said board so decided, and declared said election of said Jones illegal and void upon said ground of his acceptance of said challenge, and upon no other ground whatever; and that the other of said grounds of contest were by said board decided in favor of said Jones.”
The commonwealth not only fails to aver that the board found Jones ineligible to the office on account of a previous conviction, but distinctly negatives any such idea, and shows that the judgment of the board was based upon a supposed disqualification for office which has no legal or constitutional existence. This is not an erroneous judgment which can not be corrected on account of the want of the power or jurisdiction in another tribunal to review it. The board having no power to act in the premises, it is not a judgment at all, and is no more binding upon Jones or the courts of the state than if Cochran had based his contest upon an averment that Jones was under forty years of age, or was not a licensed attorney, or had committed some other crime or misdemeanor involving, *749 upon conviction, the forfeiture of the right to hold office. The power and jurisdiction of the board to declare an election illegal and void, and to adjudge an office to be vacant, exists in cases in which the party elected did not at the time of his election possess the requisite qualifications, or where he was not at that time exempt from all legal disqualifications.
To admit that a contesting board may determine finally as to what constitutes a legal disqualification for office would be to decide that the legislature, instead of confining these tribunals to the discharge of executive duties, and to the determination primarily of mere questions of fact, had, in disregard of the distribution of the powers of government, existing by virtue of the first article of the constitution,' created a high judicial tribunal — a court with power and authority to determine finally and conclusively questions of individual rights arising under the constitution — and provided that it should be composed exclusively of high, executive officers.
It is a matter of great difficulty to draw the exact line of demarkation between executive and judicial powers, and of still more difficulty to define with accuracy how far executive officers, in the discharge of executive or ministerial duties, may bind the other departments of goverment by the exercise of qaasi-judicial functions. But we regard it as an indisputable proposition that where the inquiry to be made involves questions of law as well as fact, where it affects a legal right, and where the decision may result in terminating or destroying that right, the powers to be exercised and the duties to be discharged are essentially judicial, and are such as can not constitutionally be delegated to or imposed upon executive officers.
The 24th section of the 3d article of the second constitution of this state provided that a secretary of state should be appointed and commissioned during the term for which the *750 governor was elected, “if he so long behave himself well.” The governor, believing that Hardin had not complied with the conditions upon which as secretary of state he was entitled to continue in office, caused to be entered upon the executive journal that he (Hardin) “ by his failure, willful neglect, and refusal to reside at the seat of government and perform the duties of secretary, has abandoned said office; and said office, in the judgment of the governor, has become vacant for the causes aforesaid. It is therefore declared by the governor, and ordered to be entered upon the executive journal, that the office of secretary has become and is vacant.” In a contest between Hardin and the auditor, growing out of this action of the governor, this court said, “The secretary being removable for breach of good behavior only, the ascertainment of the breach must precede the removal. In other words, the officer must be convicted of misbehavior in office-; and we shall not argue to prove that in a goverment of laws a conviction whereby an individual may be deprived of valuable rights and interests, and may moreover be seriously affected in his good fame and standing, implies a charge and tri^l and judgment, with opportunity of defense and proof. The law too prescribes the duties and tenure of the office, and thus furnishes a rule for the decision of the question involved. Such a proceeding for the ascertainment of fact and law involving legal right, and resulting in a decision which may terminate the right, is essentially judicial, and has been so considered here and elsewhere.” (Page v. Hardin, 8 B. Mon. 672.)
The analogy between Hardin’s case and the one under consideration, if not striking, is at least sufficiently clear to make the law'of the one applicable to the facts of the other. Hardin’s right to hold the office was coupled with the condition prescribed by the constitution that he would behave himself well, and perform such duties as were imposed upon him by the constitution and laws. Jones, like all other citizens, took *751 his right to hold office in the commonwealth coupled with the condition that he would abstain from participating- in duels with citizens of this state. ■ Each of the conditions is imposed by the constitution, and in neither case is it in express terms provided that the forfeiture of the right to the particular office in the one or of the general right to hold any office in the other should be enforced by indictment, trial, and conviction. Yet as the ascertainment of the breach must precede the infliction of the penalty, the court said in Hardin’s case, “We shall not argue to prove that in a government of laws a eonvietion whereby an individual may be deprived of valuable rights and interests, and may moreover be seriously affected in his good fame and standing, implies a charge and trial• and judgment, with the opportunity of defense and proof,” and that “such a proceeding for the ascertainment' of fact and law, involving legal right and resulting in a decision which may terminate that right, is essentially judicial.” So say we in this case.
The proceedings resulting in the declaration that Jones' is disqualified from holding or ineligible to office in this commonwealth because of his alleged acceptance of Hale’s challenge to fight a duel with deadly weapons was “essentially judicial,” and was such a proceeding as could not be constitutionally had by a board, commission, or tribunal composed of executive officers. (Sections 1 and 2, article 1, State Constitution.)
It is never to be assumed, where the language of the act will admit of any other rational construction, that the legislature overlooked or purposely disregarded a constitutional limitation upon its power. We can not therefore imply for the board the delegated power to exercise functions “essentially judicial” from any thing in the statute regulating the proceedings and prescribing the duties of such tribunals.
The conclusions already reached seem to us to obviate the necessity for noticing the question as to whether a party may *752 in any contingency demand a trial by jury in a contested election case, as also the deductions drawn by counsel from the power of civil courts to try questions of crime, and to adjudge the civil legal consequences of the crime or of the facts constituting the crime.
So. soon as the contesting board decided that Cochran had no claim to the office the contest ceased to be a civil proceeding in which the rights of individuals were to be settled. It then become a prosecution by the commonwealth, and the notice of contest supplied the place and performed the office of an information. Jones was then put in the attitude of a person charged with a public offense; and the determination of the board upon this ground of the contest is in the nature of a judicial ascertainment of the facts constituting the offense, and the judgment, if enforceable, is in the nature of a-judgment inflicting a portion of the penalty prescribed by the constitution.
But if there were no constitutional objections to the exercise of the powers claimed for the board by the commonwealth, the consequences that may follow their exercise would furnish a sufficient reason why such powers should not be implied from the provisions of the statute.
Jones may • yet be indicted and tried upon the identical, charge considered and passed upon by the board.
Section 23, article 1, chapter 29, of the General Statutes does not purport to and does not as matter of law limit the time within which a prosecution under section 20, article 8 of the constitution may be commenced.
Notwithstanding therefore the action of the contesting board, Jones may yet be indicted for the alleged offense and put upon his trial. In such a case he could not rely upon the judgment of the board to support a plea of autre fois convict. It does not inflict, nor was it intended to inflict, the whole of the punishment prescribed by the constitution. If *753 enforced, it will deprive him of the particular office to which he was elected; but it will leave the question of his absolute ineligibility to any office in the commonwealth' an open question, one to be hereafter inquired into whenever the occasion may render the inquiry pertinent. Further than this, upon such trial, had, as it must be had, in a regularly-organized court of criminal and penal jurisdiction, in which the forms of procedure established to protect private rights and intended to secure the individual against the irregular exercise of the powers of government are recognized and enforced as part and parcel of the machinery of the tribunal itself, he may, by the verdict of the jury, be found not guilty of the offense. Tn such a case, if the action of the board be upheld and enforced, it will result that he has lost a valuable office, conferred upon him by the voters of the state, on account of a supposed ineligibility or disqualification arising out of an alleged violation of a penal statute, of which violation a trial jury subsequently pronounces him not guilty.
Again, if the action of the contesting board should be accepted by Jones as conclusive of his rights under the election of 1874, but as'leaving the .question of his eligibility still an open one, and he should stand for and be re-elected to the office, and his election again contested upon the same ground, and upon precisely the same evidence as that relied on by Cochran, the contesting board, which must then be composed in part, and possibly may be composed in whole, of different persons, may find that as matter of fact he did not accept the challenge alleged to have been sent to him by Hale. In such a case the anomaly would be presented of a citizen adjudged to be disqualified to hold office by the contesting board, and its action afterward disregarded, annulled, and overturned by the successors of officers first acting in the matter- And the action of the board may just as well be reversed. A citizen may first be adjudged guiltless of the imputed offense and be *754 held eligible to office; and upon a subsequent election, and a contest upon the same ground and evidence, he may be pronounced guilty and adjudged ineligible.
An act of the legislature ought not to be so construed as to render action under it thus uncertain and inconclusive, unless .its language renders such a construction absolutely necessary. ‘Certainly no power which may thus operate should be implied from language that is open to judicial interpretation.
.In a case somewhat similar to this the Supreme Court of Pennsylvania refused to construe an act of Congress depriving a citizen or a class of citizens of the right of suffrage on account of a military offense, as the commonwealth claims the constitutional provisions and the statute under consideration ought to be construed. It held that the officers of an election could not inquire into the'facts constituting the forfeiture, saying that if after such inquiry and trial they were to decide that the party had not forfeited his citizenship, the decision would not amount to an acquittal; it would not protect him against a subsequent similar accusation and trial, and would not protect him against trial and punishment by the proper military tribunal. It further held that the deprivation of the right of suffrage must be adjudged under the act of Congress, after trial by a proper military tribunal, although the act declared in terms that all deserters who failed to return to service or report themselves to the proper officer by a named day should be deemed to have voluntarily relinquished and forfeited their rights of citizenship, and should be forever incapable of exercising any of the rights of citizens, saying that “this construction is not only required by the universally admitted rules of statutory interpretation, but it is in harmony with the personal rights secured by the constitution, and which Congress must be presumed to have kept in view. It gives to the accused a trial before sworn judges, a right to challenge, an opportunity of' defense, the privilege of hearing the wit *755 nesses against him and of calling witnesses in his behalf; it preserves to him the common-law presumption of innocence until he has been adjudged guilty according to the forms of law; it gives finality to a single trial; if tried by a court-martial and acquitted, his innocence can never again be called in question, and he can be made to suffer no part of the penalties prescribed for guilt.” (Huber v. Reilly, 53 Pennsylvania, 112.)
If the necessity for the trial and conviction of a soldier by a military court in order to deprive, him of the right of suffrage is so obvious, it is difficult to see why the trial and conviction of one not a soldier by a court of competent jurisdiction, in order to deprive him of the right to hold office, should be regarded as a matter of minor importance.
This line of reasoning applies with equal force to the first count in the indictment. Some stress is laid upon the rule of law which treats the demurrer as admitting the material facts charged. This admission, as is well known, is only for the purpose of testing the law arising upon such facts. If it were overruled, the admission would not bind the accused. He might still plead not guilty, and put the commonwealth upon the proof. But if upon the trial had he should be acquitted of the principal offense (usurpation of office), he would still be liable to be indicted and tried in the Daviess Circuit Court for the collateral offense of accepting Hale’s challenge to fight a duel. Upon the contrary, if convicted and punished for the alleged offense of usurpation of office, upon the idea that he was ineligible on account of accepting Hale’s challenge, after the punishment has been inflicted, he may be tried in the Daviess Circuit Court on said collateral charge and acquitted. In such a state of case it would result that he would, in a collateral proceeding, be punished for the consequences of an offense which the proper tribunal determines he did not commit. These illustrations demonstrate the propriety of the *756 rule forbidding the trial of a man’s guilt in any other than a direct proceeding against him. (1 Bishop’s Criminal Law, sec. 646; Gaines v. Buford, 1 Dana, 511.)
That the rule of construction, whether applied to the constitution or to a statute, which will preserve unimpaired the ancient .inode of trial by jury, is the rule which should always govern in interpreting laws involving the forfeiture of a civil or political right, seems to us to be apparent upon the mere statement of the proposition.
The importance of the questions to be decided, and the delicacy of the duty we have been called on to discharge, have induced us to state at greater length than we otherwise would have done the reasons and authorities upon which our conclusions are based. We regret the necessity which compels us to differ from those holding the highest positions in a co-ordinate department of the government, and for whose opinions we entertain the highest respect; but it is a necessity growing out of the division of governmental powers, and the duty of-disposing of it is one that must be courteously and respectfully but at the same time candidly and unhesitatingly discharged. In the discharge of that duty we but recognize and act upon that general rule “that whenever an act is done which may become the subject of a proceeding in court, any question of constitutional authority that might have been raised when the act was done will be open for consideration in such proceeding,. and that as courts must finally settle the controversy, so also will they- finally determine the constitutional law.” (Cooley on Constitutional Limitations, section 44; 8 B. Mon. 655.)
Legal controversies must be settled by the courts, and they have thus devolved on them the duty to pass upon the constitutional validity sometimes, of legislative and sometimes of executive acts. The duty of determining the constitutionality of an act performed by executive officers has been devolved on this court by the controversy arising in the prosecution of *757 the charge against Jones of the offense of usurpation of office. That duty we now proceed to discharge by adjudging:
jFirst—That the constitutional provisions relating to dueling are not self-executing, except to the extent that persons who can not or will not take the constitutional oath are thereby prevented from holding office.
Second—-That a citizen who denies that he is guilty of having violated those provisions, and is willing to take the oath of office, may enter upon and discharge the duties thereof without subjecting himself to an indictment for usurpation of office until he has first been indicted, tried, and convicted for the disqualifying offense; but that if he takes the oath falsely and corruptly, he may be indicted and prosecuted for the crime thereby committed.
Third—That the statutes regulating the proceedings and prescribing the duties of the contesting board in elections for clerk of the Court of Appeals do not empower said board to enter into an original inquiry as to whether the party elected has, by a violation of said constitutional provisions, subjected himself to be deprived of the right to hold office, nor upon their own conviction as to his guilt to adjudge him not entitled to the office, and thereupon to declare it vacant.
Fourth—That the legislature could not, if it had attempted so to do, have conferred such a power upon a board or tribunal composed of executive officers.
Wherefore, upon the whole case, the judgment of the criminal court sustaining the demurrer to the indictment and dismissing the prosecution must be affirmed.

See case of Burkett v. McCarty, post, page 758.